UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FEDERAL INSURANCE COMPANY

Plaintiff,

v.

ALBERTSON'S INC. AND AMERICAN STORES COMPANY,

Defendants.

_____________________________________/

No. C 06-04000 MHP

**MEMORANDUM & ORDER**
**Re: Cross-Motions for Summary Judgment**

On June 23, 2006 plaintiff Federal Insurance Company ("Federal") filed this complaint against defendants Albertson's Inc. and American Stores Company ("ASC"), seeking contractual indemnification and equitable subrogation in connection with an agreement between the defendants and plaintiff's insured. The parties subsequently stipulated to the dismissal of Federal's cause of action for equitable subrogation. Now before the court are the parties' cross-motions for summary judgment. The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND[1]

Plaintiff Federal is an Indiana corporation and has its principal place of business in New Jersey. Defendant ASC is a Delaware corporation with its principal place of business in Utah. Defendant Albertson, Inc. is a Delaware corporation and has its principal place of business in Idaho. Albertson's is the successor in interest to defendant ASC, which it acquired subsequent to the events in this case. The dispute in this case involves the interpretation of a Dairy Services Facilitation

UNITED STATES DISTRICT COURT
For the Northern District of California

Agreement ("Agreement" or "FA") between Federal's insured, Dean Foods Company ("Dean" or "Dean Foods") and ASC.

I. The Sale of the Dairy and Facilitation Agreement

Dean Foods and ASC entered into the Agreement on January 30, 1998, whereby Dean Foods acquired from ASC certain dairy assets, including the San Leandro dairy processing plant ("the Dairy") involved in the present dispute. The sale closed on March 1, 1998 ("Closing Date"). At issue in the instant action are several provisions of the Agreement addressing ASC's obligations to indemnify Dean Foods for certain employment-related liabilities.

In section 3.5 of the Agreement, ASC provides certain representations and warrantees regarding employment matters:

> c. Except as set forth on Schedule 3.5 attached hereto, there is no unfair labor practice, charge or complaint pending or, to the best of ASC's knowledge, threatened against or otherwise affecting ASC or its Affiliates with respect to the Employees.
>
> d. Except as set forth on Schedule 3.5, there is no labor strike, slowdown, work stoppage, dispute, lockout or other material labor controversy in effect, or to the best of ASC's knowledge, threatened against ASC or its Affiliates with respect to the Employees.
>
> e. Except as set forth on Schedule 3.5, ASC has received no notice of its or its Affiliates material violation of any law, regulation or order relating to the employment of the Employees.

Facilitation Agreement, Joint App, Exh. B. at 10. Section 8.1 requires ASC to indemnify Dean under certain circumstances including those associated with

> a. any breach of any representation or warranty, or any breach of any covenant or obligation . . . .
>
> b. the use, ownership, and possession of the Assets, occupancy of the Facilities, excepted as provided in Sections 5.1 and 5.2, employment of Employees prior to the Closing Date . . . .

Id. at 23. Two other provisions relevant to the instant dispute include section 10.2 ("Survival of Representations and Warranties") and section 5.1d(v) concerning the assumption of certain responsibilities related to employees' claims. The survival clause limits ASC's obligations for breach of representations and warranties to one year from the Closing Date.

> Section 10.2 Survival of Representations and Warranties
>
> Any and all representations and warranties set forth herein or in any Schedule or Exhibit (including but not limited to any such representations, warranties or statements made in or in connection with any amendment) shall constitute representations and warranties under this Agreement. All representations and warranties made under this Agreement shall be made or deemed to be made at and as of the date hereof and as of the Closing Date. Unless otherwise provided herein, all representations and warranties made or deemed to be made under this Agreement shall survive the Closing Date for a period of one (1) year, regardless of any investigations or inquiries made by any part, and shall not be waived by the Closing or by operation of law.

Id. at 27-28. The agreement contains a further provision relating to Dean Foods' responsibilities for employee's claims. Section 5.1(d) (Dean Employee Liabilities) states that "Dean shall be responsible for any benefits for, and claims arising after the Closing Date on behalf of, any Transferred Employee in accordance with the plans, programs or policies of Dean, if any, applicable to such Transferred Employees after the Closing Date." Id. at 16.

Under section 5.1a of the Agreement, Dean agreed to employ all of the existing Dairy employees as of the closing date of the Agreement. Id. at 15. As a result, Dairy employees March J. Williams, Lamarre Rouse, Duray Carr, Donyale Harvey, Lamott Gatson, and Juan Avila ("Underlying Plaintiffs[2]") became employees of Dean as of the closing date of the Agreement.

II. The Underlying Suit

In May 2001 the aforementioned employees filed administrative complaints against Dean Foods, alleging racial discrimination and harassment under California law. On July 13, 2002, the Underlying Plaintiffs filed suit in Alameda County Superior Court against Dean Foods as well as certain of its employees ("Underlying Action"). The Underlying Plaintiffs are all African-American or Mexican-American men who had been employed at the Dairy since the early to mid-1990s. Their complaint alleged racially discriminatory and harassing conduct at the Dairy since 1990. The

alleged conduct included ethnic slurs, name calling, administering discipline in a discriminatory manner, racially based violence, and the use of threatening symbols including "KKK" graffiti, a swastika, and bullet casings at the Diary. In their complaint and in their deposition testimony, the Underlying Plaintiffs provided evidence of the harassing and discriminatory conduct from 1990 to 2000.

The Underlying Plaintiffs filed suit against Dean but not against ASC. Federal defended Dean in the Underlying Action pursuant to Dean's insurance policy. Dean provided ASC notice of the Underlying Action and Dean's claim for indemnity under the Agreement on two occasions in February 2002. On April 25, 2002 ASC informed Dean that it would not defend Dean or indemnify it in the Underlying Action. On June 20, 2002 ASC and Dean entered into a Joint Defense Agreement for the purposes of defending the lawsuit. Joint App. Exh. E.

In February 2003 Federal and Dean entered into a Settlement Agreement and Release in which Dean assigned its rights to indemnification under the FA to Federal. On February 14, 2003 Federal and Dean reached a settlement with the Underlying Plaintiffs for a sum of $3,300,000. Albertson's and ASC did not contribute to the settlement. Federal brought suit in this court on June 28, 2006 seeking contractual indemnification and equitable subrogation under the Agreement.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence

UNITED STATES DISTRICT COURT
For the Northern District of California

of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all [claims] or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

## DISCUSSION

### I. Defendant's Liability in the Underlying Action

At the outset, Albertson's argues Dean Foods unreasonably settled with the Underlying Plaintiffs for unlawful conduct that occurred before the Dairy was transferred to Dean Foods. First, Albertson's contends that the applicable statute of limitations barred plaintiffs' recovery for pre-Closing conduct at the Dairy and thus Dean Foods' settlement for this conduct was inappropriate. Second, it argues that Dean Foods' settlement for pre-Closing conduct was unreasonable because Dean Foods could not be held liable for conduct that occurred during ASC's ownership of the Dairy under the law of successor liability. After reviewing the standard for evaluating whether an indemnitee settled reasonably, the court will consider the merits of each argument.

#### A. Evaluating Settlement

The Agreement provides for the application of Utah law. The parties agree that the laws of

California and Utah are consistent in requiring liability of the prospective indemnitee and the prospective indemnitor to a third party. Albertson's notes that "[a]s a general rule, an indemnity contract does not cover losses for which the indemnitee is not liable to a third person or for which an indemnitee improperly pays." Peter Culley & Assoc. v. Superior Court, 10 Cal. App. 4th 1484, 1493 (1992). However, Albertson's conveniently ignores the test for improper settlement by an indemnitee. The Culley court further stated, "one acting in good faith in making payment under a reasonable belief that it is necessary to his protection is entitled to indemnity or subrogation, even though it develops that he in fact had no interest to protect." Id. at 1493 (citations omitted). Stated another way, the test is whether Dean, plaintiff's insured, settled the underlying action reasonably and in good faith.

Defendant bemoans Dean's defense of the underlying claim as insufficient and even argues that Dean's counsel committed malpractice in the Underlying Action. Even if this were true, the examples of inadequate defense fall far short of the required indicia of bad faith on the part of Dean in its settlement of the underlying claim. Also, defendant points to Dean's arguments made in the Underlying Action, suggesting these are admissions that it was not liable for pre-Closing conduct for purposes of this action.[3] These too fail to support defendant's position.

B. Statute of Limitations

Albertson's argues that claims against ASC for discrimination and harassment were time-barred and, accordingly, it was not liable for any claims. Under this reasoning, Albertson's is not required to indemnify Dean Foods for claims that Dean erroneously settled. Federal argues that the Underlying Plaintiffs' claims against ASC were not time-barred because the alleged discrimination and harassment that occurred before the Dairy was transferred to Dean Foods were part of a continuing violation. According to this view, the claims in the Underlying Action based on activities during ASC's ownership of the Dairy were, therefore, validly settled by Dean Foods.

The parties agree that the relevant statute of limitations for the Underlying Plaintiffs' claims for racial discrimination and harassment under California law is one year. See Cal. Gov't Code §

12960; Cal. Civ. Proc. Code § 340(3). Albertson's argues that the statute of limitations for any claims based on conduct during ASC's ownership of the Dairy expired on March 1, 1999, one year after the closing of the Agreement and the sale of the Dairy to Dean Foods. Because the Underlying Plaintiffs filed their administrative complaints in May 2001and filed suit in July 2001, Albertson's contends that their claims for actions under Albertson's ownership were time-barred in the Underlying Action.

The continuing violations doctrine is invoked "when an employee raises a claim based on conduct that occurred in part outside the limitations period." Richards v. CH2M Hill, Inc., 26 Cal. 4th 798, 812 (2001). In such cases, "an employer [is] liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period." Id. The Richards three-part test evaluates whether to apply the continuing violations doctrine to conduct that occurred outside of the relevant statute of limitations. Under Richards, an employer's failure to remedy a hostile work environment is a continuing violation if the employer's acts 1) are sufficiently similar in kind; 2) occurred with reasonable frequency; and 3) have not acquired a degree of permanence. Id. at 823.

Albertson's seeks to add an additional requirement: that the Underlying Plaintiffs must demonstrate that at least one of the alleged acts must have been committed by ASC during the filing period. In support of this proposition, Albertson's cites one sentence taken out of context from Morgan v. Regents of Univ.of Cal., 88 Cal. App. 4th 52, 64 (2000). The complete rule in Morgan is that a continuing violation can be established by showing "a company wide policy or practice" or "a series of related acts against a single individual." Id. at 64 (citing Green v. City of Los Angeles County Superintendent of Schs., 883 F.2d 1472, 1480 (9th Cir. 1989)). Under Morgan, "a plaintiff who shows that a policy and practice operated at least in part within the limitation period satisfies the filing requirements." Morgan, 88 Cal. App. 4th at 64. The Underlying Plaintiffs alleged, and the record establishes, the ongoing environment of racist, hostile and discriminatory behavior—in the form of acts and policies—that existed at the Dairy from at least 1989 until February 14, 2003. See, e.g., SAC, Exh. B, ¶ 95 ("[H]arassment . . . is pursuant to a longstanding, deep-rooted policy and/or

practice by the management of racial discrimination against African Americans."); id. ¶ 98 ("The acts complained of herein were either approved, condoned, or taken by one or more managing agents . . . each of whom had the authority to make corporate policy and/or to direct a substantial portion of defendant's business."); id. ¶ 110 (describing offensive acts as part of overarching discriminatory policies). Morgan reiterates the rule that "[a] systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period." Morgan, 88 Cal. App. 4th at 64. It therefore does not make sense to read Morgan as Albertson's suggests, because this reading would make Morgan internally inconsistent—a bad act within the limitations period cannot be both required and unnecessary.

Even if Albertson's reading of Morgan was correct, the policies that were in effect prior to the dairy's transfer to Dean Foods certainly continued to have effect post-transfer. While Dean Foods' track record with respect to remedying the situation is by no means perfect, it is impossible to imagine how any new owner could repair such a dysfunctional workplace immediately upon transfer. Albertson's again misapplies Morgan on this point—it cites Morgan's recitation that "mere 'continuing impact from past violations is not actionable.'" Morgan, 88 Cal. App. 4th at 64 (citing Williams v. Owens-Illinois, Inc., 665 F.2d 918, 924 (9th Cir. 1982)). But on this point, Williams and Morgan distinguished between promotions or placement and refusals to hire or decisions to fire. The former may suffer from the ongoing effects of systematic discrimination, the latter being one-time actions. Neither Morgan nor Williams is susceptible to Albertson's interpretation. Furthermore, reading them in this way is inconsistent with Richards' characterization of when the continuing violations doctrine may be applied.

1. Sufficient Similarity

Richards requires that the employer's ongoing acts be sufficiently similar before and after the limitations period in order constitute a continuing violation. To support its claim that this prong has been met, Federal provides depositions from two dairy employees, Michael C. Minchey, a pre-transfer Dean Foods employee, and Terry Ray Perkins, a pre-transfer ASC employee. These

UNITED STATES DISTRICT COURT
For the Northern District of California

declarants testify that no meaningful changes occurred at the Dairy following the transfer of the Dairy to Dean. See Minchey Dec. ¶ 3; Perkins Dec. ¶ 3. Albertson's does not contest the similarity of acts that took place pre- and post-transfer; nor does it contest the similarity of the documented pre-transfer acts to other pre-transfer acts. Rather, Albertson's presents evidentiary objections, which the court addresses below, to the declarations. Therefore, the court is satisfied that Federal has established sufficient similarity.

2. Reasonable Frequency

Richards also requires that the employer's acts occur with reasonable frequency. Federal has submitted and Albertson's has not contested, for the purposes of the present motions, evidence of the underlying allegations of racial discrimination and harassment. These include allegations of unlawful conduct in each year from 1991 to 1996. Def's Mot. at 29–30. The Second Amended Complaint in the Underlying Action further details unlawful conduct alleged in each of the subsequent years up until the time the suit was filed. See ,e.g., SAC, Joint App. Exh. B ¶ 71(f) (allegations of swastika graffiti in 1997); ¶ 48(b)(e) (allegations of KKK graffiti in 1999 and confederate flag graffiti in 2001). Accordingly, the court finds that the unlawful acts occurred with reasonable frequency.

3. Permanence

Failure to remedy a hostile environment can only constitute a continuing violation if the employer's acts have not yet achieved a degree of permanence. Permanence refers to the employers' actions being of such a nature so as to sufficiently communicate to the employee that any further efforts to end the employer's conduct, or to informally remedy the environment, would be futile. Richards provides two examples for how employers' acts achieve permanence: 1) the conduct constituting a hostile work environment ends; 2) the employee is put on notice that further efforts would be futile. Id. at 824. Albertson's offers theories for satisfying both of these prongs.

First, Albertson's asserts that by transferring the Dairy to Dean, ASC necessarily ended any

UNITED STATES DISTRICT COURT
For the Northern District of California

wrongful conduct it engaged in with respect to the Dairy employees. It argues that Richards refers to a single employer and, therefore, implicitly recognizes that a change in ownership of the employer ends the unlawful conduct. Albertson's claims that Richards "characterizes the continuing violations doctrine as applying to a single employer, unlike this case . . ." Def.'s Opp. at 19. It is hardly surprising that the Richards court established a rule respecting a single-employer scenario, since that was the scenario before the court at that time. That court was not in a position to speak to multi-employer scenarios. It is inaccurate to portray the Richards court as constructing a rule with an eye toward limiting its application to scenarios which were not before it.

Albertson's also contends that under Richards, because an employee's resignation brings a discriminatory course of conduct to an end, it must also be true that an employer's "resignation" by selling the business must also bring a discriminatory course of conduct to an end. See 26 Cal. 4th at 823 (describing how an employee's resignation ends an unlawful course of conduct). Albertson's cites no case law, statute, or other authority to support this proposition nor is such a reading of Richards warranted. The Richards analysis focuses on the discriminatory conduct of the employer, not the machinations of corporate control. To the extent that Richards speaks to this issue, it suggests that the termination of course of conduct occurs not when the ownership of a facility changes hands but at the cessation of harassment. Were a change in ownership to have any bearing on the Richards analysis in the abstract, the facts here would suggest otherwise. In this case, the change in ownership brought no change in the composition of the workforce or management. Indeed, the FA itself provided for continued employment of all personnel. Agreement, § 5.1(a), Joint App, Exh. A. at 15. Therefore, neither law nor the facts support a conclusion that unlawful conduct ended upon the change in ownership.

Second, Albertson's argues that the Underlying Plaintiffs were put on notice that their further efforts to stop the unlawful conduct would be futile. To support this contention, Albertson's points to the extensive and egregious nature of the discriminatory and harassing conduct and suggests that no reasonable employee would continue to seek redress in the face of such conduct. Richards indicates that futility occurs when the employer "mak[es] clear to the employee in a definitive

manner that it will not be granting any such requests, thereby commencing the running of the statute of limitations." 26 Cal. 4th at 823-24. Harassing conduct, short of constructive discharge, is insufficient to render an employee's efforts at remediation futile. Id. The employer conduct in Richards was also very extreme; however, the Richards court focused not on the nature of the conduct but on the communications between employer and employee in analyzing futility. Id. at 824. There is no evidence before the court that the Dairy, under the ownership of either ASC or Dean Foods, communicated to the Underlying Plaintiffs that it would not take steps to remedy the harassment. To the contrary, Federal has provided evidence that there were some potential avenues for addressing these grievances, including regular visits in the mid-1990s from monitors touring the Dairy in response to a consent decree in a gender discrimination suit and, subsequently, regular inspections by a Human Resources manager. UF ¶¶ 21–22. Thus, Albertson's has failed to establish permanence.

Having concluded that Federal has satisfied the Richards test, the court concludes that application of the continuing violations doctrine is appropriate. The statute of limitations for unlawful conduct during ASC's tenure as owner of the Dairy did not commence until after the underlying lawsuit was filed. Therefore, the court concludes that the statute of limitations would not preclude a finding of liability for unlawful conduct which occurred during ASC's ownership of the Dairy.

C. Successor Liability

Defendant offers an additional basis for arguing that Dean Foods' settlement of claims for conduct that occurred during ASC's ownership was unreasonable. Under this argument, Dean Foods should not have settled claims based on pre-Closing conduct because Dean Foods could not have been held liable for these actions. Albertson's argues that there was no legal support for the imposition of successor liability on Dean Foods in the Underlying Action. Federal contends that Dean likely faced successor liability in the Underlying Action and so reasonably settled with the Underlying Plaintiffs. Under California law, a successor corporation will generally not be liable for

the tort liability of its predecessor without an assumption of liability, evidence of fraud or a merger of the two companies. See, e.g., Franklin v. USK Corp., 87 Cal. App. 4th 615, 621 (2001). However, there is some case law to suggest that in a employment context, successor liability may be imposed where there is substantial continuity of business operations, as have been established here. See Slack v. Fair Havens, 522 F.2d 1091 (9th Cir. 1975) (imposing liability on successor corporation for acts committed by predecessor corporation which violated Title VII, where the successor corporation was found to be an alter ego of the owner of its predecessor). Therefore, the court finds it reasonable for Dean Foods to have settled for pre-Closing conduct based on the possibility, albeit limited, that it would be a successor to ASC's liabilities in this regard.

In sum, the court concludes that the statute of limitations did not bar the Underlying Plaintiffs' claims based on pre-Closing conduct, and, therefore, Dean Foods' settlement of those claims was reasonable. Additionally, the potential for the imposition of successor liability, while small, was a reasonable basis for settling those claims.

## II. Contract Interpretation Issues

In evaluating Federal's claim for indemnification, the court must determine whether the Underlying Action was covered by the Indemnification Clause. Albertson's argues that the Underlying Action involved only the representations and warranties concerning employment related liabilities. It further argues that Dean Foods assumed the liability under section 5.1d(v). Finally, it contends that the Indemnification Clause does not cover a voluntary settlement.

### A. Indemnification Clause

Federal argues that the Underlying Action was covered by the Indemnification Clause, contained in section 8.1 of the Agreement. Albertson's, in turn, argues that the Underlying Action triggered the representations and warranties in section 3.5 and its applicable Survival Clause, section 10.2.

In Utah, as elsewhere, "[i]f the language within the four corners of the contract is

unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." WebBank v. Am. Gen. Annuities Serv. Corp., 54 P.3d 1139, 1145 (Utah 2002). The Agreement required ASC to indemnify Dean against all covered liabilities, as defined in the Agreement,[4] associated with

> a. any breach of any representation or warranty, or any breach of any covenant or obligation . . . .
>
> b. the use, ownership, and possession of the Assets, occupancy of the Facilities, excepted as provided in Sections 5.1 and 5.2, employment of Employees prior to the Closing Date . . . .

The plain language of section 8.1(b) suggests that the Underlying Action for employment discrimination and harassment for conduct prior to the closing date triggers ASC's obligation to indemnify Dean Foods. In response, Albertson's argues that section 8.1(a) and 8.1(b) are mutually exclusive and that where an action triggers one, it cannot trigger both provisions. Such an argument is unsupported in the case law, and Federal does not attempt to support it. The Indemnification Clause is a distinct contractual obligation from the representations and warranties contained in section 3.5, thus the two provision should be interpreted to exist independently. Federal is correct that the Underlying Action would likely also trigger ASC's duty to indemnify Dean Foods for a breach of representations and warranties. ASC made explicit representations and warranties in section 3.5 of the Agreement that there was "no unfair labor practice, charge or complaint pending or, to the best of ASC's knowledge against or otherwise affecting ASC or its Affiliates with respect to the Employees." Exh. B at 10. This provision might serve as an additional basis for Federal's indemnification claims, but the plain language of the Agreement does not require that it be the exclusive basis for doing so. Thus, the court finds that the Underlying Action is covered by section 8.1(b).

Next, Albertson's argues that its obligations under the Indemnification Clause are limited by the Survival Clause which appears in section 10.2 of the Agreement. Section 10.2 provides in relevant part:

> Any and all representations and warranties set forth herein or in any Schedule or Exhibit (including but not limited to any such representations, warranties or statements made in or in connection with any amendment) shall constitute representations and

> warranties under this Agreement. All representations and warranties made under this Agreement shall be made or deemed to be made at and as of the date hereof and as of the Closing Date. Unless otherwise provided herein, all representations and warranties made or deemed to be made under this Agreement shall survive the Closing Date for a period of one (1) year, regardless of any investigations or inquiries made by any part, and shall not be waived by the Closing or by operation of law.

Exh. B at 28. The Survival Clause, by its own language, refers explicitly to representations and warranties in section 8.1(a) and not to the broad indemnification provision in section 8.1(b). As noted above, the provisions for indemnity and for breaches of warranties and representations are separate and distinct. The court finds the plain meaning of the FA unambiguous, and the extrinsic evidence and authority cited by defendant uses language distinguishing representations and warranties from indemnification provisions. Defendant cites several practitioner's guides to establish that the Survival Clause applies to both indemnification rights and representations and warranties. See, e.g., Richard A. Goldberg & Justine F. Jones, Negotiating the Purchase Agreement, 1350 PLI/Corp 371, 426 (2003). However, an examination of the quoted passages belies this conclusion. The treatises refer to indemnification rights and representations and warranties independently, rather than conflating the two, as defendant would have this court do. Therefore, the survival clause limits the duration of only representations and warranties to one year and does not limit the indemnification rights.

B. Section 5.1d(v)

Albertson's contends that Dean Foods assumed liability for pre-Closing employment matters and points to section 5.1d(v) to support its argument. That section entitled "Dean Employee Liabilities" provides that "Dean shall be responsible for . . . any benefits for, and claims arising after the Closing Date on behalf of [] any Transferred Employee in accordance with the plans, programs or policies of Dean, if any, applicable to such Transferred Employees after the Closing Date." Exh. B at 16. Albertson's advances the absurd argument that Dean is liable for the "policy" of racial discrimination and harassment against employees per the terms of section 5.1d(v). The court must determine whether section 5.1d(v) can bear this reading. It cannot.

Construing policy to include discrimination and harassment begun during ASC's ownership

of the Dairy is a perversion of the plain language of the provision. There are additional reasons for rejecting Albertson's argument. First, section 5.1d read in context is limited to employee benefits, wages and salaries. Section 5.1d(i) requires Dean to pay all salaries and wages after the closing date. The section immediately preceding 5.1d(v) addresses Dean's responsibility for withholding all amounts required by law; the succeeding provision addresses workman's compensation. Agreement, §§ 5.1d(i),(iv),(vi), at Exh. B at 16. Therefore, it is implausible that section 5.1d(v), buried amongst provisions addressing the minutiae of wage and salary compliance, expands Dean's liability in the way suggested by Albertson's. Moreover, the presumption against indemnity agreements holding one liable for another's acts supports this reading. "In general, the common law disfavors agreements that indemnify parties against their own negligence because one might be careless of another's life and limb, if there is no penalty for carelessness. Because of this public safety concern, we strictly construe indemnity agreements against negligence." Hawkins v. Peart, 37 P.3d 1062, 1066–67 (Utah 2001) (internal citation and quotation marks omitted). Here, this presumption supports Federal's reading of the provision. Accordingly, the court concludes that Dean Foods did not assume the liability for the Underlying Action.

C. Voluntary Settlements

Almost as an aside, Albertson's argues that its obligation to indemnify Dean does not obtain because the settlement between Dean Foods and the Underlying Plaintiffs was voluntary. Albertson's provides no support for its contention that voluntariness is the test for triggering indemnification. As Albertson's notes, the Utah Supreme Court considers settlement sufficient to require indemnification in an analogous context. See Benjamin v. Amica Mut. Ins. Co., 140 P.3d 1210, 1216 (Utah 2006) ("The duty to indemnify depends upon liability, i.e., an insurer's obligation to pay a judgment or *settlement*.") (emphasis added and citations omitted). The court rejects this argument.

In sum, the court concludes that the Underlying Action was covered by the indemnification provision of the Agreement. At this stage, the parties have not presented arguments as to the precise

UNITED STATES DISTRICT COURT
For the Northern District of California

amount of Albertson's indemnity obligations, and the court has not addressed that issue. Federal's motion for partial summary judgment is GRANTED. Albertson's motion for summary judgment is DENIED.

III. Evidentiary Issues

Defendants have raised several evidentiary issues which the court will address in turn.

A. Request for Judicial Notice

Albertson's asks the court to take judicial notice of two documents filed with the SEC in order to establish that Dean Foods is a publicly traded company in 1998. The court has not considered this evidence in its disposition of the current dispute and, therefore, it need not consider the request for judicial notice.

B. Evidentiary Objections

Defendants raise objections to two declarations submitted by plaintiffs: that of Michael C. Minchey and Terry Ray Perkins.

Defendants object to the Minchey declaration for two reasons. They argue that Minchey lacked personal knowledge of the facts discussed in his declaration, and they contest the relevance of Minchey's declaration. While Minchey was never employed by ASC, he was the plant manager of the Dairy immediately after it was acquired by Dean Foods. Minchey Dec. ¶¶ 1–2. In this capacity, he had personal knowledge of any changes made—personnel, products, workforce—by Dean Foods after acquiring the Dairy. Thus, he can validly testify to whether such changes were made or whether, as he testified, the products, processes, and workforce "were substantially the same" under Dean Foods as they had been under ASC's ownership. Id. ¶ 3. The court has addressed the relevance of the Minchey declaration in its analysis of the parties' statute of limitations arguments.

They also present the argument that Perkins, as Plant Foreman, may have been a union

UNITED STATES DISTRICT COURT
For the Northern District of California

employee and not a member of the Dairy management. According to this logic, Perkins would not have the requisite personal knowledge under Rule 602 of the Dairy's operations and workforce to testify on their nature. Perkins was an employee with supervisory responsibilities and as such had personal knowledge of the composition of the work force and supervisory personnel. Perkins Dec. ¶¶ 2–3. The relevance of Perkins' declaration has been addressed previously. Therefore, the defendants' objections to both declarations are OVERRULED.

CONCLUSION

Plaintiff's motion for partial summary judgement is GRANTED. Defendant Albertson's motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated: May 11, 2007

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

ENDNOTES

1. All facts cited herein are taken from the complaint ("Complaint") or the Joint Statement of Undisputed Facts ("UF") unless otherwise noted.

2. One of the plaintiffs in the Underlying Action, Frank E. Martin III, was never employed by ASC.

3. Defendant appears to employ Dean's denials of liability in the underlying action to suggest that Dean was not actually liable to the plaintiffs for the underlying settlement and thus that the settlement was improper. This claim is without merit, as Dean's denial in the underlying claim was central to its defense. Furthermore, the substantial settlement of those claims leads the court to presume that Dean was liable. This presumption is not rebutted here by reference to Dean's denials of liability in its pleadings.

4. Covered Liabilities are defined by the FA as:

> all debts, losses, claims (including pursuant to [the indemnity agreement]), damages, costs, demands, . . . payments, liabilities of every type and nature . . . together with any reasonable costs and expenses (including, without limitation, reasonable attorneys' fees . . . ) incurred in connection with any of the foregoing (including, without limitation, reasonable costs and expenses incurred . . . preparing or defending any pending or threatened action).

Agreement, § 1.1, Exh. B at 2.