UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL INSURANCE COMPANY<br><br>        Plaintiff,<br>  v.<br>ALBERTSON'S INC. AND AMERICAN STORES COMPANY,<br><br>        Defendants.<br>_____/ | No. C 06-04000 MHP<br><br>**MEMORANDUM & ORDER**<br>**Re: Allocation** |

      On June 23, 2006 plaintiff Federal Insurance Company ("Federal") filed this complaint against defendants Albertson's Inc. and American Stores Company ("ASC"), seeking contractual indemnification and equitable subrogation in connection with an agreement between the defendants and plaintiff's insured. The parties subsequently stipulated to the dismissal of Federal's cause of action for equitable subrogation. On May 16, 2007 the court issued an order granting plaintiff's motion for partial summary judgment and denying defendant's motion for summary judgment. The court ruled that defendant Albertson's is required to indemnify Federal. Now before the court is the sole issue of the precise amount of Albertson's indemnity obligations. The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND[1]

      The court has previously provided a detailed discussion of the factual basis for the instant action in its order on the parties' cross-motions for summary judgment. See Fed. Ins. Co. v.

Albertsons Inc., 2007 U.S. Dist. LEXIS 35831 (N.D. Cal. 2007) (Patel, J.). The resolution of the current issues before the court does not require a prolonged recitation of the facts and therefore the court will limit itself to the following brief factual summary.

Plaintiff Federal is an Indiana corporation and has its principal place of business in New Jersey. Defendant ASC is a Delaware corporation with its principal place of business in Utah. Defendant Albertson, Inc. is a Delaware corporation and has its principal place of business in Idaho. Albertson's is the successor in interest to defendant ASC, which it acquired subsequent to the events in this case. The instant case arises out of a hostile work environment charge lodged by a group of San Leandro dairy processing plant employees against Federal's insured, Dean Foods Company ("Dean" or "Dean Foods") in 2001. The current issue before the court is the determination of the precise amount of Albertson's indemnity obligations under a Dairy Services Facilitation Agreement ("Agreement" or "FA").

I.   The Sale of the Dairy and Facilitation Agreement

Federal's insured, and ASC entered into the Agreement on January 30, 1998, whereby Dean Foods acquired from ASC certain dairy assets, including the San Leandro dairy processing plant ("the Dairy") involved in the present dispute. The sale closed on March 1, 1998 ("Closing Date"). This court's May 16, 2007 order on the parties' cross-motions for summary judgment relied upon relevant sections of the Agreement to rule that defendant Albertson's is obligated to indemnify Federal with regard to the underlying settlement agreement and defense costs. The relevant sections of the Agreement are set forth below.

In section 3.5 of the Agreement, ASC provides certain representations and warrantees regarding employment matters:

    c.    Except as set forth on Schedule 3.5 attached hereto, there is no unfair labor practice, charge or complaint pending or, to the best of ASC's knowledge, threatened against or otherwise affecting ASC or its Affiliates with respect to the Employees.

    d.    Except as set forth on Schedule 3.5, there is no labor strike, slowdown, work stoppage, dispute, lockout or other material labor controversy in effect, or to the

2

        best of ASC's knowledge, threatened against ASC or its Affiliates with respect to the Employees.

  e.    Except as set forth on Schedule 3.5, ASC has received no notice of its or its Affiliates material violation of any law, regulation or order relating to the employment of the Employees.

Facilitation Agreement, Joint App., Exh. B. at 10. Section 8.1 requires ASC to indemnify Dean under certain circumstances including those associated with:

  a.    any breach of any representation or warranty, or any breach of any covenant or obligation . . . .

  b.    the use, ownership, and possession of the Assets, occupancy of the Facilities, excepted as provided in Sections 5.1 and 5.2, employment of Employees prior to the Closing Date . . . .

Id. at 23. The agreement contains an additional provision relating to Dean Foods' responsibilities for employee's claims. Section 5.1(d) (Dean Employee Liabilities) states that "Dean shall be responsible for any benefits for, and claims arising after the Closing Date on behalf of, any Transferred Employee in accordance with the plans, programs or policies of Dean, if any, applicable to such Transferred Employees after the Closing Date." Id. at 16.

    Under section 5.1a of the Agreement, Dean agreed to employ all existing Dairy employees as of the closing date of the Agreement. Id. at 15. As a result, Dairy employees Marcus J. Williams, Lamarre Rouse, Duray Carr, Donyale Harvey, Lamott Gatson, and Juan Avila ("Underlying Plaintiffs"[2]) became employees of Dean as of the closing date of the Agreement.

## II.   The Underlying Suit

    In May 2001 the Underlying Plaintiffs filed administrative complaints against Dean Foods alleging racial discrimination and harassment under California law. On July 13, 2002 the Underlying Plaintiffs filed suit in Alameda County Superior Court against Dean Foods as well as certain of its employees ("Underlying Action"). The Underlying Plaintiffs are all African-American or Mexican-American men who had been employed at the Dairy since the early to mid 1990s. Their complaint ("Underlying Complaint") alleged racially discriminatory and harassing conduct at the Dairy since 1990. The alleged conduct included ethnic slurs, name calling, administering discipline in a discriminatory manner, racial violence, and the use of threatening symbols, including "KKK"

3

graffiti, a swastika and bullet casings at the Diary. In their complaint and in their deposition testimony, the Underlying Plaintiffs provided evidence of the harassing and discriminatory conduct from 1990 to 2001.

The Underlying Plaintiffs filed suit against Dean but not against ASC. Federal defended Dean in the Underlying Action pursuant to Dean's insurance policy. Dean provided ASC notice of the Underlying Action and Dean's claim for indemnity under the Agreement on two occasions in February 2002. On April 25, 2002 ASC informed Dean that it would not defend Dean nor indemnify it in the Underlying Action. On June 20, 2002, however, ASC and Dean entered into a Joint Defense Agreement for the purposes of defending the lawsuit. Joint App. Exh. E.

In February 2003 Federal and Dean entered into a Settlement Agreement and Release in which Dean assigned its rights to indemnification under the FA to Federal. On February 14, 2003 Federal and Dean reached a settlement with the Underlying Plaintiffs for a sum of $3,300,000. Albertson's and ASC did not contribute to the settlement. Federal brought suit in this court on June 28, 2006 seeking contractual indemnification and equitable subrogation under the Agreement.

On May 16, 2007, the court ruled that Dean's settlement of the Underlying Plaintiffs' hostile work environment claims was reasonable. In addition the court held that under the Agreement signed by ASC and Dean, to which Albertson's was a successor, ASC had agreed to indemnify, defend and reimburse Dean Foods for any liability arising from employment of the dairy employees prior to the Closing Date.

On October 18, 2007 this court issued an order ruling that Federal was entitled to some amount of prejudgment interest. The court declined to specify the exact amount of interest to be awarded as the allocation of the underlying settlement had yet to be determined.

Now before the court is the sole issue of determining the precise amount of Albertson's indemnity obligations under the Agreement.

4

DISCUSSION

I.  Allocation of the Underlying Settlement

This court has determined that the allocation of the settlement sum and defense costs between Federal Insurance and Albertson's should be performed in the following manner: (1) determine the beginning of the hostile work environment for each of the Underlying Plaintiffs; (2) total the number of months each of the Underlying Plaintiffs worked in the hostile work environment; (3) determine how many of the total months worked in the hostile environment were worked for ASC and how many for Dean; (4) develop a relative percentage for each; and (5) apply that percentage to the total amount of the Underlying Settlement sum still to be allocated. Once derived, this same formula will be used to determine Albertson's liability for defense costs.

As stated above the initial inquiry requires a determination of when the hostile work environment started for each of the Underlying Plaintiffs. Federal argues that the hostile work environment began for each of the Underlying Plaintiffs on their first day of employment at the Dairy. Federal supports this claim by asserting that the hostile work environment existed at the Dairy even before any of the Underlying Plaintiffs began working there.

Federal relies upon Beyda v. City of Los Angeles, 65 Cal. App. 4th 511 (1998), for the proposition that to prevail on a hostile work environment claim a plaintiff may point to their actual knowledge of hostile conduct suffered by co-workers from the same protected group. The Court of Appeal in Beyda stated that "[t]he plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others. A woman's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers." (quoting Lehmann v. Toys R' Us, Inc., 132 N.J. 587 (1993)). While the court finds that plaintiff has correctly stated the holding of Beyda, this case fails to support plaintiff's argument that the hostile environment began on the first day of work for each of the Underlying Plaintiffs. A review of the Underlying Plaintiffs' complaint (the "Underlying Complaint") reveals that the Underlying Plaintiffs made only vague allegations of discriminatory treatment beginning on the first day of their employment. Such vague allegations are not sufficient

5

evidence to show that the Underlying Plaintiffs had actual knowledge of a hostile work environment at the Dairy.

The Court of Appeal in <u>Beyda</u> also stated that, "[i]f . . . a plaintiff neither witnesses the other incidents [of sexual harassment] nor knows that they occurred, those incidents cannot affect his or her perception of the hostility of the work environment." <u>Id.</u> at 519. The allegations contained in the Underlying Complaint do not offer evidence that the Underlying Plaintiffs witnessed the hostile work environment at the Dairy from the very beginning of their employment. The vague allegations that racial harassment occurred "[s]ince the beginning of . . . employment" does not provide enough detail for the court. As the Court of Appeal in <u>Beyda</u> stated, the standard for a hostile work environment claim is whether "a reasonable person in the plaintiff's position would find the conduct severely hostile or abusive." <u>Id.</u> Without more concrete allegations this court cannot merely assume, as Federal urges, that each Underlying Plaintiff would have been exposed to the hostile work environment from their very first day of employment at the Dairy.

Rather, the court determines that the beginning of the hostile work environment for each of the Underlying Plaintiffs should be the time when those employees first claim to have suffered or witnessed a specified act of discriminatory conduct. The parties have failed to provide the court with full deposition testimony and therefore in many instances determining the exact date upon which discrimination first occurred is not possible. In the absence of exact dates, the court relies upon the Underlying Complaint. Although the Underlying Complaint occasionally refers to specific dates, in other instances it refers to only a year.

Underlying Plaintiff Williams alleged that he had endured the racial jokes of coworkers John Henry and Mark Santana since 1992. Absent a reference to a specific month, the court begins counting the time period of the hostile work environment from the middle of the year.

Underlying Plaintiff Rouse alleged that his non-African American coworkers, Paul and Charles Comer, told racial jokes since the beginning of his employment in November 1996.

Underlying Plaintiff Carr alleged that in 1990 he observed the words "KKK is Here" on a stall wall in the men's bathroom at work. Absent a reference to a specific month, the court begins counting the time period of the hostile work environment from the middle of the year.

Underlying Plaintiff Harvey alleged that in 1993 he heard to his foreman, Doug Shane, repeatedly refer to African American employees as "colored people." Absent a reference to a specific month, the court begins counting the time period of the hostile work environment from the middle of the year.

Underlying Plaintiff Gatson alleged that in approximately 1995 he observed the letters "KKK" written on the wall in the "case room." Absent a reference to a specific month, the court begins counting the time period of the hostile work environment from the middle of the year.

Underlying Plaintiff Juan alleged that in January 2001 he was told by co-worker Kelly Smith, "I hate Mexicans and blacks. I like white people with white skin and blue eyes." The first instance of discriminatory treatment alleged by Avila occurred almost three years after the transfer of ownership of the dairy. Therefore, Avila's allegations of a hostile work environment fall wholly outside of the time period for which ASC has indemnity obligations.

The court has determined that Albertson's is required to indemnify Dean Foods for the period of hostile work environment that occurred before the Closing Date ("ASC Liability Period") and that Dean Foods is responsible for the hostile work environment after the Closing Date ("Dean Liability Period"). Based upon the foregoing evidence the Underlying Plaintiffs worked, in a hostile work environment, for ASC a total of 264 months and for Dean for 331 months.[3] Altogether, the total months worked by all the Underlying Plaintiffs during the liability period is 595. The relative percentage is 44.37% for ASC and 55.63% for Dean.

Federal and Dean paid a total of $3,300,000 to settle the Underlying Action, and as stated above the court has held this settlement amount to be reasonable. From that total amount, $375,000 is deducted as that was paid by Dean in order to secure the resignations of the Underlying Plaintiffs. As Dean alone reaped the benefit of this portion of the settlement it should not be included in the amount to be allocated between Federal and Albertson's. The remaining $2,925,000 was therefore paid by Federal to settle the seven Underlying Plaintiffs' hostile work environment claims. However, two of the seven plaintiffs, Frank Martin and Juan Avila, should not be included in the allocation. Federal concedes that Frank Martin began his employment with Dean in April 1998 and was never employed by Albertson's. Juan Avila, began working for ASC in June of 1991, however

7

1  he did not allege to have suffered or witnessed any specific incidents of discriminatory conduct
2  before January 2001. For these reasons the remaining settlement amount shall be reduced by two-
3  sevenths, or $835,713 to remove Martin and Avila from the allocation. This leaves a total of
4  $2,089,287 of the settlement amount to be allocated between Federal and Albertson's.

Application of the relative percentages to this sum provides a breakdown of $927,017 for Albertson's and $1,162,270 for Dean.

## II.   Allocation of Defense Costs

Federal asserts that the total amount of defense costs incurred in the Underlying Action is $801,958. From this total amount Federal agreed to deduct all defense costs paid for the defense of Jeff Smatsky, one of the individual supervisory defendants. Smatsky was not ever employed by Albertson's and therefore costs expended in his defense should not be indemnified by Albertson's. Deducting the $148,037 in defense costs for Smatsky paid by both Dean and Federal leaves $653,921. In addition, for the remaining amount the costs incurred in defense of those other individuals who only worked for Dean and not Albertson's should be deducted. Federal asserts that this amounts to a further deduction of $50,766 leaving a total of $603,155 to be allocated between Albertson's and Federal. As previously stated, the same allocation formula shall be applied to settlement costs as to the defense costs.

As with the allocation of the settlement of the Underlying Action, the defense costs for two of the seven Underlying Plaintiffs should not be included in the allocation. Therefore, the total of $603,155 should be reduced by two-sevenths, or $172,321. This leaves a total of $430,834 in defense costs to be allocated between Federal and Albertson's.

Application of the relative percentages (44.37% for ASC and 55.63% for Dean) to the total defense costs, provides a total of $191,161 to ASC and $239,673 to Dean.

## III.   Prejudgment Interest as Applied to the Underlying Settlement

A federal court sitting in diversity applies the substantive law of the state in which it sits, and applies federal procedural rules. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also

1  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (district court exercising diversity
2  jurisdiction must follow substantive law, including choice-of-law rules, of forum state).
3  Prejudgment interest is a matter of substantive rather than procedural law and is therefore governed
4  by state law. See In re the Exxon Valdez, 484 F.3d 1098, 1101 (9th Cir. 2007) cert. granted sub.
5  nom. Exxon Shipping Company v. Grant Baker, 2007 U.S. Lexis 11805 (2007) (holding that
6  "prejudgement interest is a substantive aspect of a plaintiff's claim, rather than a merely procedural
7  mechanism") (citation omitted).
8       Section 3287(a) of the California Civil Code governs prejudgment interest and provides:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.

12  Cal. Civ. Code § 3287(a). "[O]ne purpose of section 3287 . . . is to provide just compensation to the
13  injured party for the loss of use of the award during the prejudgment period—in other words, to
14  make the plaintiff whole as of the date of the injury." Lakin v. Watkins Associated Indus., 6 Cal. 4th
15  644, 663 (Cal. 1993) (citations omitted).
16       The parties have differing views of when prejudgment interest began to accrue with respect
17  to the underlying settlement amount. Federal asserts that it is entitled to prejudgment interest from
18  the date of the settlement of the Underlying Action. Albertson's counters that the appropriate date to
19  begin to run the prejudgment interest calculation is March 14, 2005 the date upon which Albertson's
20  responded to Federal's February 10, 2005 demand letter. On October 18, 2007 this court held that
21  Federal Insurance is entitled to interest on the percentage of the settlement amount allocated to
22  Albertson's, with interest beginning to accrue on the date of the settlement agreement. See Docket
23  Entry 150, ¶ 4. As the court noted, however, Federal did not file the present action until June 2006,
24  three years after the Underlying Settlement was executed. The court stated that it would consider
25  any undue delay by Federal in bringing this action to compel Albertson's contribution to the
26  settlement amount after it had become apparent that Albertson's would not otherwise willingly
27  contribute. Id. at ¶ 5.
28       In February 2003 Dean, Federal Insurance and the Underlying Plaintiffs settled the

9

1  underlying action.  At all times before, during and after settlement negotiations ASC refused to
2  contribute to the defense or settlement costs in the Underlying Action.  Despite ASC's refusal to
3  contribute to the defense or settlement of the Underlying Action, Federal Insurance delayed until
4  February 10, 2005, two years after the settlement, before contacting defendants.  See Lehavi Dec. ¶
5  18.  Albertson's responded timely to Federal's demand in a letter dated March 14, 2005.
6  Defendant's response repeated its refusal to contribute to defense and settlement costs, or to engage
7  in any settlement discussions.  See Id., Exh. 16.

8       Federal asserts that it made repeated demands for Albertson's to contribute to the defense
9  costs and the settlement amount in the Underlying Action.  The pertinent inquiry for awarding
10  prejudgment interest, however, is when Federal made contribution demands once the amount of
11  damages was certain or capable of being made certain.  See Cal. Civ. Code § 3287.  In this case, the
12  settlement amount did not become fixed until February 2003 when it was executed between Federal,
13  Dean and the Underlying Plaintiffs.  By plaintiff's own admission, it failed to contact Albertson's
14  for two years following the execution of the underlying settlement.  See Lehavi Amended Dec. ¶ 18.

15       From February 2003 to February 2005 Albertson's had no notice that a settlement amount
16  had been fixed.  The court does not deem it equitable to apply pre-judgment interest to the two years
17  during which Federal failed to act.  Federal has failed to properly mitigate its damages, and while
18  according to Federal it "proceeded to evaluate its options regarding ASC" during the time from the
19  payment of the underlying settlement, until February 2005, it should not be allowed to collect
20  interest on that time.  "The doctrine of mitigation of damages holds that '[a] plaintiff who suffers
21  damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to
22  mitigate those damages and will not be able to recover for any losses which could have been thus
23  avoided.'" Valle De Oro Bank v. Gamboa, 26 Cal. App. 4th 1686, 1691 (Cal. Ct. App. 1994)
24  (citations omitted); see also Cal. Civ. Code § 3527 (providing that "[t]he law helps the vigilant,
25  before those who sleep on their rights.").

26       Therefore, the court determines that the appropriate date from which to begin calculating
27  prejudgment interest is March 14, 2005, roughly 30 days after Albertson's received notice of the
28  Underlying Settlement.

10

Both parties agree that the applicable interest rate for prejudgment interest is 10 percent per annum. See Cal. Civ. Code § 3289 (providing that contracts entered into after January 1, 1986, which do not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach); see also Utah Code Ann. § 15-1-1(2) (providing that "[u]nless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum").

Prejudgment interest at a rate of 10% per annum, calculated from March 14, 2005 until the entry of this judgment, November 27, 2007 totals $251,185.

At a November 7, 2007 pretrial conference the court provided Federal and Albertson's with leave to file written arguments, not to exceed five pages, on the sole issue of the appropriate prejudgment interest rate. Blatantly ignoring the court's instructions, Federal filed over 30 pages of materials rehashing arguments already ruled upon by this court. The court dismisses these arguments as exceeding the scope of argument permitted by the court.

IV.     Prejudgment Interest as Applied to the Defense Costs

As stated above, pursuant to Cal. Civ. Code § 3387, an injured party is entitled to prejudgment interest for damages "certain, or capable of being made certain." Federal argues that it should be entitled to prejudgment interest on defense costs as well as the underlying settlement. Federal asserts that at the time of the settlement the amount of defense costs due by Albertson's was capable of being made certain. The court does not agree. Despite Federal's assertions, Ms. Lehavi's demand letter on February 10, 2005 did not mention any specific amount of defense costs. Lehavi Dec. Re Trial Brief, Exh. 16. Instead, Ms. Lehavi's demand letter states that "Federal seeks contribution from ASC for the defense costs expended on ASC's behalf." Id. Federal vigorously asserts that defense costs were capable of being made certain and argues that distinguishing between the settlement amount and defense costs for purposes of prejudgment interest calculation is impossible. However, Federal's arguments are undermined by its own communications to Albertson's.

Although Ms. Lehavi's demand letter of February 10, 2005 stated specific settlement

amounts, it failed to give any precise information regarding defense costs. Given the ambiguity with which the request for defense costs was made, the court finds that these costs were not certain or capable of being made certain. For the foregoing reasons, the court denies plaintiff's request to award prejudgment interest on the defense costs for which Albertson's is responsible to indemnify Federal.

CONCLUSION

For the foregoing reasons, defendant Albertson's is ordered to indemnify plaintiff Federal $927,017 for the underlying settlement, $251,185 for prejudgment interest on that amount and $191,161 for defense costs of the underlying action. Therefore, the total amount of indemnification owed by Albertson's to Federal equals $1,369,363.

IT IS SO ORDERED.

Dated: November 27, 2007

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

ENDNOTES

1. All facts cited herein are taken from the complaint ("Complaint") or the Joint Statement of Undisputed Facts ("UF") unless otherwise noted.

2. One of the plaintiffs in the Underlying Action, Frank E. Martin III, was never employed by ASC.

3. A calculation error was found in the court's previous allocation. Therefore, the current numbers differ very slightly from those stated by the court at the pretrial conference on November 7, 2007.